UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

SCOTT B.,[1]

                                    Plaintiff                    DECISION AND ORDER

-vs-
                                                                1:19-CV-1084 CJS
COMMISSIONER OF SOCIAL
SECURITY,

                                    Defendant.

———————————————————————

INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant") which

denied the application of Plaintiff for Social Security Disability Insurance benefits.   Now before

the Court is Plaintiff's motion (ECF No. 9) for judgment on the pleadings and Defendant's

cross-motion (ECF No. 12) for the same relief.   For the reasons discussed below, Plaintiff's

application is granted, Defendant's application is denied, and this matter is remanded for

further administrative proceedings.

STANDARDS OF LAW

The Commissioner decides applications for SSDI and SSI benefits using a five-step

sequential evaluation:

> A five-step sequential analysis is used to evaluate disability claims. *See* 20
> C.F.R. §§ 404.1520, 416.920.   First, the Commissioner considers whether the
> claimant is currently engaged in substantial gainful activity. If he is not, the

---

[1] The Court's Standing Order issued on November 18, 2020, indicates in pertinent part that, "[e]ffective
immediately, in opinions filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in the
United States District Court for the Western District of New York, any non-government party will be identified and
referenced solely by first name and last initial."

Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in the regulations [or medically equals a listed impairment].   Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.[2] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.   The claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at step five.

*Colvin v. Berryhill*, 734 F. App'x 756, 758 (2d Cir. 2018) (citations and internal quotation marks omitted)

An unsuccessful claimant may bring an action in federal district court to challenge the Commissioner's denial of the disability claim.   In such an action, "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.A. § 405(g) (West).   Further, Section 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."

The issue to be determined by the court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *see also, Barnaby v. Berryhill*, 773 F. App'x 642, 643 (2d Cir. 2019) ("[We] will uphold the decision if it is supported

---

[2] Residual functional capacity "is what the claimant can still do despite the limitations imposed by his impairment." *Bushey v. Berryhill*, 739 F. App'x 668, 670–71 (2d Cir. 2018) (citations omitted); *see also*, 1996 WL 374184, Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

by substantial evidence and the correct legal standards were applied.") (citing *Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) and *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).").

"First, the [c]ourt reviews the Commissioner's decision to determine whether the Commissioner applied the correct legal standard." *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *see also, Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) ("[W]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If the Commissioner applied the correct legal standards, the court next "examines the record to determine if the Commissioner's conclusions are supported by substantial evidence." *Tejada v. Apfel*, 167 F.3d at 773.   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (citation omitted).

> The substantial evidence standard is a very deferential standard of review—even more so than the 'clearly erroneous' standard, and the Commissioner's findings of fact must be upheld unless a reasonable factfinder would have to conclude otherwise." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (emphasis in original). "An ALJ is not required to discuss every piece of evidence submitted, and the failure to cite specific evidence does not indicate that such evidence was not considered." *Id*.

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019), as amended (Apr. 30, 2019) (internal quotation marks omitted).

In applying this standard, a court is not permitted to re-weigh the evidence. *See, Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) ("Krull's disagreement is with the ALJ's weighing of the evidence, but the deferential standard of review prevents us from reweighing it."); *see also, Riordan v. Barnhart*, No. 06 CIV 4773 AKH, 2007 WL 1406649, at *4 (S.D.N.Y. May 8, 2007) ("The court does not engage in a *de novo* determination of whether or not the claimant is disabled, but instead determines whether correct legal standards were applied and whether substantial evidence supports the decision of the Commissioner.") (citations omitted).

## FACTUAL and PROCEDURAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this action.   The Court will refer to the record only as necessary for purposes of this Decision and Order.

Plaintiff maintains that at age 45, he had a "nervous breakdown" in August 2015 from which he has never recovered, and that his mental impairments, along with some physical problems, render him completely disabled.   Prior to the alleged onset of disability, Plaintiff had worked twenty-four years for the same employer, Cintas Corporation ("Cintas"). Tr. 154, 220. For Cintas, Plaintiff worked as a training coordinator and then as a service manager. Tr. 189. During his last full year of employment with Cintas, Plaintiff earned $75,000.00. Tr. 168, 171. Plaintiff's education consists of high school and several years of college. Tr. 189.   Plaintiff is twice divorced and resides with his girlfriend.

Regarding the specific nature of the alleged disabling impairments, the Court will briefly summarize the medical evidence consisting of approximately 400 pages.   On July 27, 2011, Plaintiff complained to his primary care physician, Timothy Gabryel, M.D. ("Gabryel"), of feeling

"loopy" at night, and stated that he had experienced two panic/anxiety attacks, while working 60 hrs/wk at his job. Tr. 271.   On August 3, 2011, Plaintiff reported that he was improved on Seroquel, with no loopy spells, and that he was reducing his hours at work. Tr. 274.   On September 12, 2011, Plaintiff told Gabryel that he felt improvement from taking Xanax, though he was having marriage problems. Tr. 279.

On October 27, 2011, Plaintiff had an initial visit with psychiatrist Maria Cartagena, M.D. ("Cartagena").   Plaintiff was complaining of anxiety, panic, angry outbursts, worry and feeling overwhelmed. Tr. 307.   Plaintiff indicated, though, that he was not depressed and could still concentrate. Tr. 307.   Plaintiff was having marital problems. Tr. 307. ("Second marriage 6 years in duration and under severe strain due to severe irritability."). Cartagena noted that Plaintiff appeared anxious and restless, with hypochondria and somatic thoughts, but that his examination results were otherwise normal. Tr. 308. Cartagena's diagnosis was "generalized anxiety disorder" and "R/O [rule out] bipolar disorder, R/O [rule out] intermittent explosive disorder." Tr. 308.   Cartagena prescribed Seroquel and Xanax, and referred Plaintiff for counseling with a therapist. Tr. 308.

On November 8, 2011, Plaintiff told Cartagena that he had stopped taking Seroquel because it made him feel too sedated, but that Pristiq and Xanax helped him feel less anxious. Tr. 309.   Although, Plaintiff still complained of anxiety, fearfulness and feeling overwhelmed. Tr. 309.   Cartagena noted that Plaintiff appeared anxious and restless, with somatic thoughts. Tr. 309.

On June 6, 2012, Plaintiff told Cartagena that he was doing "real good," and that Pristiq was working better than other drugs that he had tried. Tr. 319.   Plaintiff denied depressed

mood, agitation or mood lability, but continued to complain of anxiety, fearfulness, feeling overwhelmed and sleep problems. Tr. 319.

At some point in 2012, Plaintiff's second marriage ended in divorce. Tr. 154.

On January 3, 2013, Cartagena reported nearly identical findings as at past visits, and Plaintiff continued on Pristiq and Xanax. Tr. 323-24.   Throughout 2013 and into 2014, Plaintiff continued to take Pristiq and Xanax and reported feeling better.

On April 29, 2013, Gabryel noted that Plaintiff was taking Pristiq for depression and Xanax for anxiety. Tr. 291.

On November 5, 2013, Gabryel reported that Plaintiff's depression and anxiety were "chronic stable conditions" and that Plaintiff's "mood has been ok." Tr. 292.

On April 17, 2014, and again on August 14, 2014, Cartagena reported that Plaintiff had no complaints and had indicated that Pristiq worked much better than other medications, and that he denied anxiety, depression, restlessness, fearfulness or feeling overwhelmed, though he said he still had worry and sleep problems. Tr. 335, 338.   Plaintiff also reported that his job was going well and that he had a good relationship with his girlfriend of two years. Tr. 338.

On August 11, 2014, Plaintiff reportedly told Gabryel that he was not depressed. Tr. 298.

On June 25, 2015, Plaintiff told Cartagena that he was still doing well on Pristiq, but was having increased anxiety due to "job related stressors and family obligations." Tr. 341. Cartagena noted that the psychotherapy portion of their session had focused on "identifying how [Plaintiff's] mood and anxiety ha[d] become exacerbated due to work and family stressors," and "how [he could] become supportive of his nephew without risking mood

6

deterioration." Tr. 343.

On August 25, 2015, Plaintiff reportedly told Gabryel that he was not depressed, but that his panic attacks had gotten worse, for which he had seen Cartagena, who increased the Pristiq and Xanax dosages. Tr. 303.

On September 1, 2015, Plaintiff called Cartagena's office and indicated that he was "not so good," in that while on vacation he had had "severe panic attacks and unexplainable depression," and that he had not gone to work for two weeks after returning from vacation. Tr. 344.   As will be discussed further below, Plaintiff has subsequently maintained that he suffered a "nervous breakdown" in August 2015, and that he became disabled on August 14, 2015, just two weeks before this office visit.   However, at this visit with Cartagena, there was no mention of a nervous breakdown, and the only symptoms Plaintiff related were that he had had an incident of panic attacks and unexplained depression while on vacation.   At the office visit, however, Plaintiff reportedly denied any anxiety, depression, fearfulness, mood lability or feelings of being overwhelmed or mood lability, though he did claim to feel worried. Tr. 344. Further, Plaintiff reported that his energy level and ability to concentration were good. Tr. 344.

On September 23, 2015, Plaintiff presented to Cartagena claiming to be in significantly worse shape, evidently in response to stress at work. Tr. 347.   Plaintiff stated that he felt overwhelmed at work and was pacing at home. Tr. 347.   Plaintiff stated that he was having "pushback from his employer about his time off and [for taking leave under the Family Medical Leave Act ("FMLA")]," and that he could not "conceive of ever being able to return to work." Tr. 347.   Plaintiff reported being agitated, anxious, fearful, depressed and overwhelmed, with decreased energy level and concentration. Tr. 347.   Cartagena noted that the psychotherapy

portion of the visit was dedicated to dealing with "the emotional blow of what [Plaintiff felt was] disloyalty from a company that he ha[d] worked at for over twenty years." Tr. 349. Cartagena adjusted Plaintiff's medications by discontinuing Xanax and adding Risperidone for mood stabilization and Klonopin for anxiety. Tr. 349.

On October 5, 2015, Plaintiff told Cartagena that his anxiety was improved, but that he still felt anxious when asked to do simple tasks. Tr. 350.   Cartagena noted that she would continue the Risperidone and Klonopin, since they were helping, but would discontinue Pristiq and try Cymbalta. Tr. 352.

On October 22, 2015, Plaintiff told Cartagena that he was doing better and having "more good days," with "much improved" depression but with anxiety "still above baseline." Tr. 353.   On November 23, 2015, Plaintiff told Cartagena that he was having more good days, with decreased panic, but that he was still having difficulty functioning consistently. Tr. 356-57.

On December 16, 2015, Plaintiff told Cartagena that he was "a little better," but still with "episodes of disabling anxiety," primarily in the evenings. Tr. 361.   Cartagena reported that Plaintiff appeared anxious and restless, with somewhat impaired memory, concentration and attention. Tr. 361.

On January 6, 2016, Plaintiff reported to Cartagena that he was having less anxiety and fewer panic attacks, but still was having "trouble coping with stressors." Tr. 365.

On February 3, 2016, Cartagena noted that Plaintiff was having "a lot less anxiety" and decreased panic attacks. Tr. 368-369.   Plaintiff further stated that his anxiety was improved despite having been terminated from his job and losing his health insurance coverage. Tr. 369. However, Plaintiff reported ongoing anxiety, agitation, depressed mood, and feeling

overwhelmed. Tr. 369.

On March 9, 2016, Plaintiff told Cartagena that his anxiety was much better provided that he took his medications. Tr. 372.   Cartagena indicated that Plaintiff did not have 100% compliance in taking his medications, purportedly due to issues with concentration and distractibility, but that he was having less anxiety and displaying better time management. Tr. 373.

On March 11, 2016, Plaintiff applied for Social Security disability benefits, claiming that he became unable to work on August 14, 2015, due to depression, anxiety, heart palpitations and high blood pressure. Tr. 75, 188.[3]

On April 27, 2016, Plaintiff reported to Cartagena that he was "good physically" and had lost 38 pounds. Tr. 423.   Mentally, Plaintiff stated that he still had "some recurrent irritability," "some recurrent negativity" and "some mild depression." Tr. 424.   Plaintiff indicated, though, that his depression and fearfulness had decreased, his attention and concentration had improved, and his interest in usual things had improved, though he still felt overwhelmed frequently. Tr. 424.   Cartagena noted that Plaintiff appeared anxious, and she estimated that his memory was somewhat impaired and that his attention and concentration were fair. Tr. 424.

On June 22, 2016, Cartagena reported that Plaintiff claimed to be "feeling better but [was] still having light sleeping issues." Tr. 428.   Plaintiff stated that he had negative thoughts sometimes and that his mind tended to race in a negative way.   Plaintiff also indicated that he was having ongoing agitation and anxiety. Tr. 428.   However, Plaintiff stated that his

---

[3] Citations ("Tr.") are to the administrative transcript unless otherwise noted.

depression, panic attacks and fearfulness had decreased and that his sleep and ability to concentrate had improved. Tr. 428.   Cartagena noted that Plaintiff was taking his medications (Cymbalta, Klonopin and Risperidone) as prescribed and without any side effects. Tr. 428.

On June 10, 2016, psychologist Susan Santaria, Ph.D. ("Santarpia") conducted a consultative psychiatric examination at the Commissioner's request. Tr. 379.   Plaintiff told Santarpia that he had incidents of panic attacks in 2004 and 2011/2012, but they had resolved with medication.   Plaintiff stated that subsequently, he had no problem with depressive symptoms until April 2015, when his nephew and the nephew's girlfriend moved in with him. Tr. 380.   Plaintiff told Santarpia that the nephew and his girlfriend argued a lot and created too much stress, so Plaintiff had to "kick them out" of his house in August 2015. Tr. 380.   Plaintiff stated that, "simultaneously," he was under a lot of stress from his job.   Plaintiff indicated that those stressful events caused him to suffer a "nervous breakdown," characterized by depressed mood, crying spells, loss of usual interests and social withdrawal. Tr. 380.   Plaintiff stated that since August 2015, his symptoms had not returned to "baseline," and he continued to have problems with worry, restlessness, concentration and difficulty falling asleep. Tr. 380. Plaintiff told Santarpia that he lived with his girlfriend and that his daily activities included dressing, bathing, laundry, light shopping, driving, going out infrequently, having some interaction with family and friends, caring for his dog, pursuing a hobby making plaques, listening to the radio and spending time with his girlfriend. Tr. 382.   Santarpia conducted an examination, the results of which were normal, with the only exceptions being "slightly anxious" affect and only "fair" insight and judgment. Tr. 382.   Otherwise, Santarpia reported normal thought processes, intact memory, intact attention and concentration, neutral mood, well-

groomed appearance, appropriate eye contact and average cognitive functioning. Tr. 381.

Santarpia's diagnoses were generalized anxiety disorder, panic disorder and adjustment

disorder with depressed mood. Tr. 382.   Santarpia's medical source statement indicated that

Plaintiff could follow and understand simple directions and instructions, perform simple tasks

independently, maintain attention and concentration, maintain a regular schedule, make

decisions, relate adequately with others and appropriately deal with stress, but he would have

mild impairment in learning new tasks and performing complex tasks independently. Tr. 382.

On July 20, 2016, Plaintiff went to Suburban Psychiatrict Associates seeking therapy to

go along with his medical management by Dr. Cartagena. Tr. 431.   Plaintiff reported

symptoms of anxiety, but generally stated that he felt "ok" and "not bad." Tr. 431.   The

psychotherapy assessment was performed by Rosemary Trimboli-Burgio, LCSW ("Trimboli-

Burgio").   Plaintiff indicated that he had been having a very stressful time in August 2015, due

to work stress, relationship problems, family loss, and conflict with his nephew, and felt that he

had a nervous breakdown.   Regarding his former employment, Plaintiff indicated that he felt

that his employer had placed an "unrealistic workload" on him. Tr. 432.   Plaintiff told Trimboli-

Burgio that since then, his treatment with Cartagena was having positive results. Tr. 431.

Plaintiff stated that his current symptoms included sleep problems, depression, sadness,

crying spells, feelings of hopelessness and helplessness, difficulty focusing, forgetfulness,

irritability, inability to manage time, worrying and rumination.   However, he indicated that his

symptoms had "greatly improved" since August 2015. Tr. 431.   Trimboli-Burgio noted that

Plaintiff's mental health diagnoses were depression and generalized anxiety disorder. Tr. 432.

Trimboli-Burgio reported that Plaintiff had been punctual for his appointment, that he appeared

11

anxious, that his attention span and concentration seemed normal, that his judgment was intact and realistic, and that his thought processes were coherent and logical. Tr. 433. Trimboli-Burgio reported that Plaintiff had problems with anger, self-esteem, impulsivity and phobic symptoms. Tr.433.

On July 18, 2016, Gabryel reported that Plaintiff was "generally doing well with no specific complaints." Tr. 470.

On July 19, 2016, Plaintiff told Trimboli-Burgio that he had a problem with time management, involving spending too much time on the internet. Tr. 438.   Plaintiff stated that his symptoms were about the same, though he was only "mostly compliant" with his medications.   Plaintiff asserted that he did not look forward to many things, though he was "semi looking forward" to going to Italy with his girlfriend in September. Tr. 438.

On July 27, 2016, Plaintiff told Cartagena that he was "status quo" and was taking his medications as prescribed. Tr. 499.   Plaintiff indicated that he still had anxiety and feelings of being overwhelmed, but decreased depression, panic attacks and fearfulness. Tr. 499. Plaintiff stated that he had felt more anxious and self-isolating when his girlfriend's family had visited recently. Tr. 499.   Cartagena noted that the results of an earlier MRI scan of Plaintiff's brain had included brain lesions, possibly related to "MS," presumably meaning multiple sclerosis. Tr. 501.   However, Plaintiff has never been diagnosed with that illness, and the record does not indicate that he has had any symptoms related to such findings.

On August 10, 2016, Cartagena reported that Plaintiff had stopped taking Depakote because it made him feel over-sedated, and that he was not having increased depression or anxiety. Tr. 503.

On September 2, 2016, Plaintiff consulted with urologist Anthony Ricottone, M.D. ("Ricottone") concerning problems with urgency and incomplete emptying of the bladder. Tr. 455.   Testing indicated a partial blockage of the urethra by the prostate, and Plaintiff was prescribed medication.

On September 7, 2016, Cartagena reported that Plaintiff's symptoms were improved from the last visit, though he still felt anxious and overwhelmed. Tr. 506.   Cartagena's mental status exam results were generally unchanged. Tr. 508.   Cartagena indicated that Plaintiff was tolerating his medications well and that his mood was stabilizing. Tr. 509.

On October 5, 2016, Plaintiff told Cartagena that he was "pretty good." Tr. 511. Plaintiff's self-reported symptoms remained essentially the same. Tr. 512.   Cartagena indicated that she was going to discontinue Plaintiff's prescription for Risperidal since it was not effective, though the reason for that statement is not evident from her note. Tr. 519. In place of Risperidal, Cartagena started Plaintiff on Rexulti.   Cartagena noted that the psychotherapy portion of their office visit focused on stress that Plaintiff was having over a conflict between his family and his girlfriend. Tr. 519.

On December 21, 2016, Plaintiff saw Ricottone again and continued to complain of incomplete bladder voiding.   Ricottone noted that Plaintiff was in the habit of consuming a number of bladder irritants including coffee, diet soda and energy drinks, and recommended continued medication and diet modification.

On January 11, 2017, Plaintiff told Cartagena that he was "alright," but that his concentration was poor. Tr. 526.   Plaintiff indicated that he was less anxious but "still not back to his baseline," apparently referring to his condition prior to August 2015. Tr. 527.   Cartagena noted that she was going to reduce the dosage of Cymbalta, since she thought it might be causing Plaintiff's anxiety, and add Paxil. Tr. 529.

On January 18, 2017, Plaintiff had an initial consultation with a new mental health therapist John Perak, LCSW-R ("Perak"), after discontinuing treatment with Trimboli-Burgio because he did not like her. Tr. 45-46, 600.   Plaintiff complained of depression, anxiety, wild mood swings, confusion, difficulty maintaining focus and difficulty managing time.   Plaintiff told Perak that his current problems began after he took FMLA leave from his job at Cintas due to feeling stressed and unsupported by his new boss. Tr. 600.   Plaintiff told Perak that Cintas eventually terminated his employment, even though he wanted to continue working as a manager. Tr. 600.[4]   Plaintiff stated at that same time he was under tremendous stress due to the death by suicide of his nephew Christopher, whom he had previously housed and cared for. Tr. 601.[5]   Plaintiff further told Perak that his problems were also precipitated by his second divorce, that occurred in 2012. Tr. 601.   Perak's examination of Plaintiff was essentially normal except that Plaintiff seemed angry and "slightly depressed" about the perceived mistreatment he had received from Cintas. Tr. 602.

---

[4] Although Plaintiff told Perak that he had wanted to continue working for Cintas, in September 2015 he told Cartagena that he had already decided that he did not see how he could ever return to work.
[5] There is no other reference to such a suicide in the medical record, including Cartagena's notes, which seems odd since Plaintiff saw Cartagena quite frequently.   Nor did Plaintiff mention such an event to Santarpia or Timboli-Burgio when describing to them the genesis of his mental health problems.

14

On March 22, 2017, Plaintiff reported to Cartagena that "on certain days he felt really good and over the top calm." Tr. 531.   Plaintiff also reported better sleep and improved concentration. Tr. 532.   Cartagena noted that Paxil seemed to be helping. Tr. 535.

On May 24, 2017, urologist Ricottone reported that Plaintiff was "doing well, offering no complaints," and that he had made the recommended dietary changes which improved his condition. Tr. 460.

On June 7, 2017, Plaintiff told Cartagena that he was "alright, but having headaches again." Tr. 541.   Plaintiff explained that he was having dizziness and headaches that he had not experienced for years.   Cartagena wondered whether these symptoms might be related to the findings on the brain MRI scan, and recommended that Plaintiff follow up with a neurologist concerning the headaches. Tr. 541, 543.

On June 14, 2017, Plaintiff began treating at Dent Neurologic Institute ("Dent") for headaches. Tr. 585.   Neurologist Nicolas Saikali, M.D. ("Saikali") examined Plaintiff and reported normal findings, including intact recent and remote memory and appropriate attention span and concentration. Tr. 586-587.   Saikali did observe some decreased range of motion in the neck, side to side. Tr. 587.   Saikali also ordered a new MRI, after noting that Plaintiff had an abnormal MRI in 2011. Tr. 587.

On June 24, 2017, Plaintiff had a new MRI scan of his brain that was generally consistent with the prior MRI in 2011, showing abnormal findings consistent with a cavernous malformation. Tr. 496.

On July 5, 2017, Plaintiff told Cartagena that Saikali had prescribed medication that was helping with his headaches. Tr. 545.   Plaintiff reported continuing anxiety. Tr. 545.

15

On October 23, 2017, Gabryel noted that Plaintiff was "generally doing well" and that his depression was stable. Tr. 485.   Gabryel further reported that Plaintiff had denied feeling depressed or hopeless. Tr. 485.

On October 25, 2017, Plaintiff reported to Cartagena that he felt a "bit deteriorated" due to headaches and poor sleep, as well as from family stress involving his girlfriend. Tr. 549.

On December 7, 2017, Cartagena reported that Plaintiff was feeling better than at their last visit, and that he had admitted that prior to the last visit he had not been taking his medications as he should. Tr. 553.   Plaintiff indicated that more recently his fiancé had helped by "putting his meds together" for him. Tr. 553.   Cartagena observed: "Today presents with longer hair and a new tattoo.   Reports that for many years had to wear hair short and buzzed plus shirts and ties for work, and now that working at home,[6]  feels freer to be more relaxed." Tr. 553.   Plaintiff reported increased depression and anxiety. Tr. 553. Cartagena observed, though, that Plaintiff seemed less anxious during the session. Tr. 554.

On March 7, 2018, Plaintiff told Cartagena that he was having trouble sleeping, in that he was waking up earlier than he wanted. Tr. 557.   Plaintiff also claimed that his anxiety and depression had increased, but that his concentration had improved.   Plaintiff stated that he was seeing a neurologist and chiropractor for headaches.   Cartagena noted that Plaintiff was "doing well with Paxil and Rexulti and only takes Klonopin at night." Tr. 560.

---

[6] At the administrative hearing, the ALJ pointedly asked Plaintiff about this entry and how he was "working at home." Tr. 59.   Plaintiff answered that the "work" consisted of several things, namely, he was writing a book, making crafts and selling them online, and writing his weekly sports column (500-1100 words per column) for a online sports website. Tr. 58-62.

On April 4, 2018, Plaintiff told Gabryel that he was still having urological problems, and had left Dr. Ricottone's care after a dispute with him over a missed appointment. Tr. 489.

On May 2, 2018, Plaintiff returned to Dent, and reported having multiple mild headaches and one debilitating headache per week. Tr. 570.   Christopher Zulawski, FNP ("Zulawski") reported that his neurologic examination of Plaintiff was unremarkable, and that Plaintiff's short-term and long-term memory were intact. Tr. 571.   Zulawski indicated that Plaintiff's headaches were likely due either to stress or to cervicalgia, and that while the brain MRI showed some abnormalities, they were not causing the headaches. Tr. 572.   Zulawski prescribed amitriptyline for headaches. Tr. 572.

On May 29, 2018, Cartagena completed a medical source statement in support of Plaintiff's application for disability benefits. Tr. 561-563.   Cartagena indicated, first, that she saw Plaintiff every three months for major depressive disorder and generalized anxiety disorder, and that his prognosis was "poor." Tr. 561.   When asked to list the signs and symptoms of Plaintiff's condition, Cartagena noted anhedonia, appetite disturbance, decreased energy, generalized persistent anxiety, mood disturbance, persistent disturbances of mood or affect, difficulty thinking or concentrating, emotional withdrawal, memory impairment, sleep disturbance and recurrent severe panic attacks. Tr. 561-62.   When asked to rate Plaintiff's mental abilities to perform unskilled work, Cartagena stated that Plaintiff would be seriously limited (but not precluded) with regard to remembering work procedures, understanding short and simple instructions, maintaining attention for two-hour segments, working with or near others without being distracted, performing at a consistent pace, asking simple questions, accepting instructions and criticism, getting along with co-workers, being aware of normal

17

hazards, adhering to standards of neatness and cleanliness, traveling in unfamiliar places and using public transportation. Tr. 562-563.   Cartagena stated that Plaintiff would be "unable to meet competitive standards" with regard to maintaining regular attendance, sustaining an ordinary routine, making simple work-related decisions, completing a normal workday and workweek without interruption from symptoms, responding appropriately to changes, dealing with normal work stress, interacting appropriately with the public and maintaining socially appropriate behavior. Tr. 562-563.   Cartagena further asserted that it was hard for Plaintiff to leave his house or to drive a car.   Finally, Cartagena estimated that Plaintiff would be absent from work more than four days per month. Tr. 563.

The Commissioner denied Plaintiff's initial application for disability benefits, finding that, although Plaintiff had impairments consisting of essential hypertension and anxiety disorders, he was not disabled.   Plaintiff thereafter requested a hearing before an Administrative Law Judge ("ALJ").

On July 18, 2018, a hearing was held at which Plaintiff, accompanied by a non-attorney representative, testified, as did a vocational expert ("VE").   Plaintiff's representative indicated that Plaintiff was claiming severe impairments consisting of depressive disorder, generalized anxiety disorder, headaches and urinary frequency. Tr. 34.   Plaintiff testified that he was unable to work due to anxiety, panic attacks, lack of focus, problems with short term memory, lack of sleep, headaches, back problems and urinary frequency. Tr. 40-41.   Plaintiff indicated, however, that despite those conditions, he was able to shower and dress himself, perform cooking and household chores, care for two dogs, take the dogs for walks three days per week, drive himself places, perform shopping, go out to restaurants "quite often," go to a movie

18

theater, go to the gym at least once a week, install a sump pump and garbage disposal, mow the lawn, take his dogs to the veterinarian, make plaques and photography to sell online, begin writing a book, write a weekly online 500-1100-page column concerning the Buffalo Bills[7] and travel occasionally. Tr. 52-   Regarding travel, Plaintiff acknowledged that since the alleged onset date he had traveled by himself to Las Vegas for a family wedding, and that he had traveled with his girlfriend for a week to Rome, Italy, where they took taxis and visited various sites including the Vatican, to Toronto twice – once just for fun and once to attend a concert, and to New York City where they took in a Broadway show and a concert. Tr. 52-54.

Although, Plaintiff insisted that all of these activities were negatively impacted in one way or another by his alleged impairments.   For example, Plaintiff stated that at the Broadway show he attended, he had "bladder issues" that required him to "run to the bathroom," which caused him anxiety. Tr. 66.[8]   Plaintiff also stated that because of his problems with attention and focus, it might take him "three days to do something easy around the house." Tr 40.

Plaintiff further testified that he had "many" side-effects from his medications, including feeling sedated and "loopy," becoming forgetful and losing track of time. Tr. 64.   However, the Court observes that Dr. Cartagena's treatment notes typically stated that Plaintiff did not report any side effects from his medications. *See, e.g.*, Tr. 499 ("Does not note any medication side effects."); *same*, 503, 507, 517, 527, 522, 532.

---

[7] Plaintiff began writing this column in September 2015, at the same time that he stopped working for Cintas. Tr. 60.   Plaintiff's testimony was equivocal as to whether the column was weekly or biweekly. Tr. 60 ("It's called a weekly article but its probably biweekly.").

[8] As further evidence of this, Plaintiff offered that he used to go to every Buffalo Sabres and Buffalo Bills game, but had not done so since 2015, and implied that it was because he cannot handle being in crowds. Tr. 67. However, Plaintiff also indicated that he used to attend those sporting events to "schmooze" with clients in connection with his job at Cintas, which he no longer had after 2015. Tr. 67 ("I used to go to every game, sit in the suites and schmooze with the clients[.]")

Regarding his headaches, Plaintiff testified that they were made worse by being out in the sun, and by "staring at a computer screen." Tr, 65.   Plaintiff stated that his headaches had not improved at all from treating at Dent.

On September 14, 2018, the ALJ issued a decision finding that Plaintiff was not disabled at any time between the alleged disability onset date and the date of her decision. The ALJ performed the five-step sequential evaluation discussed above and found, in pertinent part, that Plaintiff had severe impairments, consisting of "urinary frequency with high residual volume," migraine headaches, depression and anxiety, which did not (either singly or in combination) meet or medically equal a listed impairment. Tr. 6.   The ALJ further found that Plaintiff had the RFC to perform light work, with the following limitations:

> [T]he claimant is limited to simple routine tasks; simple work-related decisions; minimal changes in work routines and processes; no strict production quotas; can tolerate no more than moderate levels of noise as defined in the DOT and its related publications; can never tolerate exposure to unprotected heights and moving machinery or moving mechanical parts; should avoid working with bright lights or flickering lights such as would be experienced in welding or cutting metals; is able to work in a low stress work environment (defined as including simple instructions and tasks, no supervisory duties, no independent decision-making, no strict production quotas, minimal changes in work routine and processes); can perform no repetitive neck movements (defined as movements that require essentially the same, repeated neck motions that must be completed in a regular, repetitive sequence without an opportunity for a break such as on a production line, where an individual would be required to turn his or her neck to identify an object coming down the line, turn it again to manipulate the object, and turn it once more to send the object on its way).

Pl.'s Mem. of Law at p. 16 (quoting Tr. 8).

In explaining this RFC finding, the ALJ asserted that it was "supported by the objective medical evidence, the claimant's treatment history, the claimant's admitted activities and the credible opinion evidence." Tr. 11.   The ALJ observed that Cartagena's records showed that Plaintiff's mental health symptoms were increasing despite adjustments in his medication through early 2016, but that thereafter he showed improvement that coincided with his efforts to be more compliant in taking his medications. Tr. 9.   The ALJ noted that in 2017, Plaintiff reported problems with sleep and variable anxiety, but that in December 2017 he reported feeling better, and admitted that previously he was not taking his medications regularly. Tr. 9. The ALJ further stated that despite Plaintiff's complaints, he "remained fairly active by traveling overseas, and writing articles for websites," and he told Cartagena that he felt freer "working at home." Tr. 9. Additionally, the ALJ noted that Plaintiff denied depression when he visited Gabryel. Tr. 9.

With regard to Plaintiff's urological problems, the ALJ stated that the condition had, according to Ricottone, improved with medication and dietary changes, and that while Plaintiff claimed to have ongoing problems, he had not seen a urologist since May 2017. Tr. 9-10. The ALJ noted that Plaintiff claimed that this gap in treatment was because he was having difficulty finding a new doctor, but the ALJ observed that Plaintiff had not mentioned urological problems during his visit with Gabryel in October 2017. Tr. 10.

With regard to Plaintiff's headaches, the ALJ noted that they did not appear related to the longstanding abnormal findings on the MRI, and that Plaintiff reported having good results with medications designed to abort his headaches. Tr. 10.

Additionally, the ALJ noted that Plaintiff claimed to have difficulty remembering things,

but that he had no difficulty relating his medical and psychological history and testing showed his memory to be intact. Tr. 7.   Th ALJ further stated that while Plaintiff claimed to have difficulty relating to others due to irritability and angry outbursts, he had maintained the same romantic relationship throughout the relevant period, and the record did not otherwise show that he had any significant limitation interacting with others. Tr. 7. Further, the ALJ observed that although Plaintiff claimed to have problems with maintaining attention and concentration, he was able to drive, write articles, and post things online, which indicated that he was able to maintain attention to things that interest him. Tr. 7.

Based upon all of the foregoing, the ALJ concluded that Plaintiff's complaints were not entirely consistent with the evidence and were not consistent with Plaintiff's "allegations of total disability." Tr. 10.

With regard to opinion evidence, the ALJ indicated that she had considered all opinion evidence in accordance with the requirements of 20 CFR § 404.1527. Tr. 8.   The ALJ then indicated that she gave little weight to the opinion of a non-examining state agency review physician, since the doctor had never examined Plaintiff. Tr. 10.   Next, the ALJ found that Cartagena's opinion was also entitled to little weight, as it was inconsistent with the observations in her treatment notes.   On this point, the ALJ remarked: "[The treatment notes] show fluctuating issues with recent and immediate memory, but intact memory skills at times. The claimant's attention span and concentration are noted as fair and [sic] anxious mood, despite the claimant's admissions of at least periodic improvement in anxiety with his medications." Tr. 10.   The ALJ further stated that Cartagena's opinion that Plaintiff would have significant limitations in remembering work-like procedures and [performing other activities"

22

was not consistent with Plaintiff's "work writing online articles," and that Cartagena's opinion that Plaintiff would have difficulty dealing with others was inconsistent with Plaintiff's "extensive travel, concert attendance and other activities." Tr. 10.   As for Santarpia's opinion, the ALJ also gave it little weight, since it was based on a single examination and was "not consistent with the record. Tr. 10.

The ALJ further stated that with the RFC finding set forth above (which essentially limited Plaintiff to light work that was simple, non-stressful and did not involve repetitive neck movement), Plaintiff could not perform his past relevant work.   However, the ALJ found that Plaintiff could perform other light work, such as "housekeeping," and "photocopy machine operator." Tr. 12.   Consequently, the ALJ concluded that Plaintiff was not disabled.   The Appeals Council denied Plaintiff's request for review, and the ALJ's decision is the Commissioner's final ruling.

In this action, Plaintiff contends that the ALJ committed the following errors that require a remand, either for the calculation of benefits or for further administrative proceedings: 1) the ALJ did not apply the treating physician rule when considering the opinion of Cartagena; 2) the ALJ "collectively weighed" all of the opinion evidence and failed to explain the weight assigned to each opinion; 3) the ALJ "rejected all opinion evidence" (giving each opinion only "little weight") and relied on her own judgment when making the RFC finding, leaving that finding unsupported by substantial evidence;[9]  and 4) the ALJ did not properly evaluate Plaintiff's credibility.

---

[9]  *See*, Pl.'s Mem. of Law at p. 16 ("[B]y rejecting all opinion evidence, the ALJ's common sense mental RFC finding based upon her own lay interpretation of the objective medical evidence and activities is inadequate to constitute substantial evidence.").

Defendant disputes Plaintiff's arguments and maintains that the ALJ's decision is free of reversible legal error and supported by substantial evidence.

The Court has carefully reviewed and considered the parties' submissions.

DISCUSSION

As discussed earlier, Plaintiff raises essentially four grounds for reversal: 1) the ALJ did not apply the treating physician rule when considering the opinion of Cartagena;   2) the ALJ failed to properly explain the weight given to the various medical opinions;   3) the ALJ "rejected all opinion evidence" (giving each opinion only "little weight") and relied on her own judgment when making the RFC finding, leaving that finding unsupported by substantial evidence; and 4) the ALJ did not properly evaluate Plaintiff's credibility.

Having considered these issues in light of the entire record, the Court concludes that the ALJ provided an adequate explanation for her evaluation of Plaintiff's credibility,[10] as well as an adequate explanation for why she did not give controlling weight to Cartagena's medical opinion.[11]

However, the Court agrees with Plaintiff that the ALJ did not thereafter provide a sufficient explanation of the weight assigned to the various medical opinions, including Cartagena's opinion, to allow this Court to properly evaluate Plaintiff's two remaining claims.[12]

---

[10]  The ALJ found that Plaintiff's complaints were not entirely credible, based on his extensive activities of daily life, and that finding is neither legally erroneous nor unsupported by substantial evidence.

[11]  The ALJ found that Cartagena's opinion is inconsistent with Plaintiff's actual extensive activities of daily life, (much of which Cartagena may not have been aware of, since there is no mention of them in her treatment notes).   That finding is neither legally erroneous nor unsupported by substantial evidence. *See, Feliciano v. Berryhill*, No. 6:16-CV-06311 (MAT), 2017 WL 3537130, at *5 (W.D.N.Y. Aug. 17, 2017). ("[I]nconsistencies between a claimant's activities of daily living and a treating physician's opinion are a valid consideration for the ALJ.").

[12]  "When assigning less than 'controlling weight' to a treating physician's opinion, the ALJ must 'explicitly consider' the four factors announced in *Burgess v. Astrue*, 537 F.3d 117 (2d Cir. 2008). Estrella v. Berryhill, 925 F.3d 90, 95 (2d Cir. 2019) (internal quotation marks omitted). Those factors are '(1) the frequen[cy], length,

That is, the ALJ's analysis is so terse that the Court cannot tell which, if any, of the parts of the various medical opinions she accepted and which parts she rejected.   Because of that, the Court also cannot determine whether the ALJ's RFC finding is properly supported or whether, as Plaintiff contends, the ALJ arbitrarily substituted her own judgment for competent medical opinion.[13]   In that regard, while the record arguably contains evidence that could support the various aspects of the RFC finding, the Court can only speculate as to what evidence the ALJ actually had in mind when she made her RFC finding with its various components. Accordingly, remand for further administrative proceedings is required.[14]

CONCLUSION

For the reasons discussed above, Plaintiff's motion (ECF No. 9) for judgment on the pleadings is granted, Defendant's cross-motion (ECF No. 12) for the same relief is denied, and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this Decision and Order.

---

nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.' *Id*. at 95–96 (citation omitted).   A reviewing court should remand for failure to consider explicitly the *Burgess* factors unless a searching review of the record shows that the ALJ has provided 'good reasons' for its weight assessment. *Id*. at 96." *Meyer v. Comm'r of Soc. Sec.,* 794 F. App'x 23, 26 (2d Cir. 2019).

[13] It is well settled that an ALJ cannot arbitrarily substitute his own lay opinion for competent medical opinion evidence. *See, e.g., Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) ("[T]he ALJ cannot arbitrarily substitute h[er] own judgment for competent medical opinion." *McBrayer v. Secretary of Health and Human Servs*., 712 F.2d 795, 799 (2d Cir. 1983).").   However, an ALJ is entitled to make an RFC finding that is consistent with the record as a whole, even if it does not perfectly match a particular medical opinion. *See, Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (Rejecting argument that ALJ had improperly substituted his medical judgment for expert opinion, stating that: "Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole."); *see also, Camille v. Colvin*, 652 F. App'x 25, 29 n. 5 (2d Cir. 2016) ("The ALJ used Dr. Kamin's opinion as the basis for the RFC but incorporated additional limitations based on, inter alia, the testimony of Camille that she credited. An ALJ may accept parts of a doctor's opinion and reject others.") (citations omitted).

[14] The Court does not find that the record is such that it would be appropriate to remand solely for calculation of benefits.

So Ordered.

Dated: Rochester, New York
     March 15, 2021

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge